UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

SELECTIVE INSURANCE COMPANY )
OF AMERICA, )
 )
    **Plaintiff,** )
 )
 )    No. 1:18-cv-00002
v. )    CHIEF JUDGE CRENSHAW
 )
KCS CONSTRUCTION, LLC, et al., )
 )
    **Defendants.** )

## MEMORANDUM OPINION

Selective Insurance Company of America ("Selective" or "Surety") brought this diversity action against KCS Construction, LLC ("KCS"), and its two members (collectively, the "Indemnitors"), Wade and Jessica Kincaid, to enforce an Indemnity Agreement. (Doc. No. 1.) Before the Court is Selective's Motion for a Preliminary Injunction. (Doc. No. 11.) For the following reasons, Selective's Motion is granted.

    I.    BACKGROUND

On March 21, 2016, KCS, though Wade Kincaid as its Managing Member, signed a General Agreement of Indemnity as an Indemnitor with Selective as the Surety. (Doc. No. 13-1 at 8; Doc. No. 17-1 at 1.) Wade and Jessica Kincaid also signed the agreement as individual Indemnitors. (Doc. No. 13-1 at 9; Doc. No. 17-1 at 1.) The Indemnity Agreement states that if Selective "shall establish a reserve to cover any liability, claim asserted, suit, award or judgment in connection with any Bond, or any loss, cost, expense or fee in connection therewith," KCS, Wade Kincaid, and Jessica Kincaid shall "immediately, upon demand . . . provide to [Selective] at its Home Office, funds and/or other collateral security, which [Selective] in its sole discretion

deems adequate, equal in value to such reserve and any increase thereof as collateral security on such Bond." (Doc. No. 13-1 at 2.) If the Indemnitors fail to do so, "they shall be in default of [the Indemnity Agreement]." (Id.) Their failure to provide collateral

> shall constitute irreparable harm to Surety for which it has no adequate remedy at law and that Surety may obtain injunctive relief compelling the delivery to Surety of sufficient collateral or in the alternative, Surety may obtain a judgment against each or any of the Indemnitors for the amount of the Collateral Demand plus the costs of obtaining the judgment, including attorneys fees by any legal or equitable process.

(Doc. No. 13-1 at 2.) The Indemnity Agreement also stated that Selective

> shall have continuous and uninterrupted access to the books, records, accounts and nonconsumer and consumer credit reports of the Indemnitors and to all matters and information concerning any Bond(s) or instrument(s) executed by Surety and the financial condition, credit worthiness and assets of any Indemnitor until the liability of Surety under each and every Bond or other instrument executed by it and each and every obligation of the Indemnitors under this Agreement is terminated and discharged to the satisfaction of the Surety.

(Doc. No. 13-1 at 4-5.)

In reliance on the Indemnity Agreement, Selective issued performance and payment bonds on behalf of KCS on two construction projects in Kentucky and Tennessee. (Doc. No. 13 at 2.) The Obligees of those construction projects have signaled their intent to pursue claims against KCS, and in turn the performance bonds, due to delays in the project. (Doc. No. 13 at 2-4.) Selective established loss and expense reserves totaling $802,285.00 because of the claims against its bonds.[1] (Doc. No. 13 at 4.) After twice previously demanding payment from the Indemnitors, on January 5, 2018, Selective demanded that they (1) tender payment of $66,152.80 to Selective for fees and expenses that Selective has already paid in relation to its ongoing investigation and defense of the liability that has been asserted against Selective; (2) deposit collateral in the amount

---

[1] The current claims against the bonds totaled $1,358,829.17 as of March 22, 2018. (Doc. No. 20 at 2.) However, the only evidence of a collateral demand, required by the Indemnity Agreement, is for $802,285.00. (Doc. No. 13 at 5.)

2

of $802,285.00, equaling the aggregate amount of the expense and loss reserves Selective has established; and (3) provide a date and location at which Indemnitors will provide Selective continuous and uninterrupted access to Indemnitors' books, records, accounts, nonconsumer/consumer credit reports, etc. (Doc. No. 13 at 5.)

KCS, for its part, is actively working to resolve all claims against the bonds. (Doc. No. 17-1 at 2-3.) It has identified defenses to the claims of both projects, is actively working on both projects, and is not in default. (Doc. No. 17-1 at 2-3.) As of February 27, 2018, KCS expected to complete both projects by the end of March. (Doc. No. 17-1 at 2-3.) It provided a reviewed financial report to Selective in November 2017. (Doc. No. 17-1 at 3.) On February 8, 2018, KCS offered as collateral to assign its interest in a pending real estate purchase agreement, which is expected to net approximately $1,200,000. (Doc. No. 17-1 at 4.) On February 9, 2018, KCS offered as alternative collateral to provide Selective with a lien against five acres of commercial property that KCS currently utilizes as its office, valued at $1,200,000. (Doc. No. 17-1 at 4.) Selective rejected both offers of collateral, instead demanding a blanket lien on all residential and commercial owned by the Indemnitors. (Doc. No. 17-1 at 4.) A cash collateral in excess of $800,000 would bankrupt KCS and make it impossible for it to complete work on both projects. (Doc. No. 17-1 at 4.) There is no evidence about how a deposit of over $800,000 would affect Wade and Jessica Kincaid individually.

On May 2, 2018, Selective filed a supplemental declaration that it has paid "or will very soon be paying" $1,210,008.22 in claims on behalf of KCS. (Doc. No. 24-1 at 2.) It also noted $254,950.15 of unresolved claims against its bonds. (Doc. No. 24-1 at 2.) It asked the Court to expedite decision on the preliminary injunction to avoid any irreparable harm to Selective. (Doc. No. 24-1 at 2.)

II.     ANALYSIS

Selective seeks a preliminary injunction against Indemnitors, requiring them to (1) deposit collateral security with Selective totaling $802,285.00, which equals the aggregate amount of the reserves that Selective has established, and (2) provide Selective continuous/uninterrupted access to their financial records. (Doc. No. 12.) The Indemnitors do not dispute the facts, but instead argue that Selective is not likely to succeed on the merits because Selective has not complied with its obligation to act in good faith in assessing its exposure and attempting to enforce the Indemnity Agreement. (Doc. No. 17 at 6.)

In determining whether to grant a preliminary injunction, the Court considers four factors: whether (1) "the moving party has a likelihood of success on the merits"; (2) "the movant will suffer irreparable harm without a preliminary injunction"; (3) "issuance of a preliminary injunction would cause substantial harm to others"; and (4) "the public interest would be served by issuance of a preliminary injunction." McNeilly v. Land, 684 F.3d 611, 615 (6th Cir. 2012) (citing Am. Imaging Servs., Inc. v. Eagle-Pitcher Indus, Inc. (In re Eagle-Pitcher Indus., Inc.), 963 F.2d 855, 858 (6th Cir. 1992)). "Each of these factors '[should] be balanced against each other and should not be considered prerequisites to the grant of a preliminary injunction.'" Liberty Coins, LLC v. Goodman, 748 F.3d 682, 690 (6th Cir. 2014) (quoting Leary v. Daeschner, 228 F.3d 729, 736 (6th Cir. 2000)). The moving party has the burden to show entitlement to a preliminary injunction. Platt v. Bd. of Com'rs on Grievances and Discipline of Oh. Supreme Court, 769 F.3d 447, 453 (6th Cir. 2014) (citing Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)).

   1. *Likelihood of Success on the Merits*

Here, Selective has a substantial likelihood of success favoring a preliminary injunction. The parties agree that Tennessee law governs this diversity action. (Doc. No. 12 at 14; Doc. No.

17 at 6.) Courts in Tennessee give the words of an indemnity agreement "their natural and ordinary meanings . . . and must give meaning and effect to every provision of the agreement." Long v. McAllister-Long, 221 S.W.3d 1, 11 (Tenn. Ct. App. 2006) (citing references omitted). "Generally, there are two recognized defenses an indemnitor can raise when a surety seeks reimbursement for claims settled over the principal's protest: (1) that the surety did not settle in good faith or (2) that the surety did not act in a reasonable and prudent manner." Old Republic Sur. Co. v. Eshaghpour, No. M1999-01918-COA-R3-CV, 2001 WL 1523364, at *2 (Tenn. Ct. App. Nov. 30, 2001) (citing John Hinchey, Surety's Performance Over Protest of Principal: Considerations and Risks, 22 TORT & INS. L.J. 133, 148 (1986)). "Tennessee law requires that, in order for a surety to recover under an indemnity agreement, the surety must act both reasonably and in good faith." Id. (citing Feld Truck Leasing v. ABC Transnational Transp., 681 S.W.2d 554, 556 (Tenn. Ct. App. 1984)).

To act reasonably and in good faith, a surety has "a duty to reasonably investigate the claim, counterclaims and all possible defenses and act in good faith in settling a claim." Id. at *3 (citing S. Fire & Cas. Co. v. Norris, 250 S.W.2d 785, 790 (Tenn. Ct. App. 1952)). "The indemnitor has the concomitant duty to fully cooperate with the surety." Id. (citing S. Fire & Cas. Co., 250 S.W.2d at 790). "The party seeking to avoid enforcement of the indemnity agreement" has the burden of proof on the affirmative defenses of bad faith and unreasonableness. Id. (citing Ass'n of Owners of Regency Park Condo. v. Thomasson, 878 S.W.2d 560 (Tenn. Ct. App. 1994)).

Here, the Indemnitors did not prove that Selective has failed to investigate the claim, counterclaims, and all possible defenses, nor have they established that Selective is not acting in good faith in settling the claim. Instead, the Indemnitors argue that they have "attempted to provide adequate collateral in response to Selective's demands," and the "rejection of this tender by Selective was unreasonable and/or made in bad faith." (Doc. No. 17 at 8.) They further argue that

5

KCS will suffer financial hardship if the Court accepts the Indemnification Agreement as written. (Id.) However, the "natural and ordinary meaning" of the contract states that the Indemnitors must post cash collateral, and if they do not post cash collateral, Selective has "sole discretion" whether to accept an alternative. (Doc. No. 13-1 at 2.) Selective elected not to accept the alternative collateral on either of the Indemnitors' properties, which it was entitled to do under the contract.

A judge in this District, applying Tennessee law has upheld the "sole discretion" provision on collateral in an Indemnification Agreement. Great Am. Ins. Co. v. SRS, Inc., No. 3:11-cv-970, 2011 WL 6754072, at *7 (M.D. Tenn. Dec. 23, 2011) (Trauger, J.). In Great American, when the principal fired the contractor, the insurance company was required to hire a new contractor to complete the job. Id. at *5. The insurance company demanded collateral of $900,000.00 from the original contractor, which had no cash. Id. Judge Trauger, citing multiple cases, found that the bad faith affirmative defense does not "defeat a surety's right to a preliminary injunction for specific performance of the collateralization obligation." Id. at *8 n.10 (citing First Nat'l Ins. Co. of Am. v. Sappah Bros., Inc., 771 F. Supp. 2d 569, 574 (E.D.N.C. 2011)). She further held that (1) there was evidence supporting the claims on the bonds, (2) the contractor contractually agreed to payment of collateral unless the insurance company agreed otherwise in its sole discretion, and (3) there was no financial hardship defense to specific performance of the indemnification agreement. Id. at *7. The Indemnitors do not cite any case contrary to Judge Trauger's persuasive analysis, and the Court follows it here.

The Indemnitors do not argue against Selective's request—and the agreed upon contractual requirement—to have continuous and uninterrupted access to the Indemnitors' financial information, as defined in the contract, other than to say that it already gave Selective a financial report in November 2017. (Doc. No. 17.) This is not sufficient under the plain language of the

contractual terms, and the Indemnitors cite no case law that this contractual term is somehow unenforceable. Selective has established a substantial likelihood of success on its access claim.

   *2. Irreparable Harm*

Selective will suffer irreparable harm if the Court does not grant a preliminary injunction. First, the parties contractually agreed that failure to post collateral "shall constitute" irreparable harm. (Doc. No. 13-1 at 2.) "[C]ourts have routinely found that sureties suffer immediate, irreparable harm if they are denied receipt of collateral after liability has been asserted against them. Great Am. Ins. Co., 2011 WL 6754072, at *8 (citing Am. Motorists Ins. Co. v. United Furnace Co., Inc., 876 F.2d 293, 302 (2d Cir. 1989); Int'l Fid. Ins. Co. v. Anchor Envt'l, Inc., No. 07-04750, 2008 WL 1931004, at *7 (E.D. Pa. May 1, 2008); and U.S. Fid. & Guar. Co. v. J. United Elec. Contracting Corp., 62 F. Supp. 2d 915, 923 (E.D.N.Y. 1999)). The irreparable harm has four basis: (1) to ensure that its insurance is "fully collateralized before it sustains additional losses; (2) protection from any loss that might result from Indemnitors' insolvency and/or dissipation of assets; (3) motivation that the Indemnitors will promptly resolve outstanding claims; and (4) creation of a fund from which [the surety] may resolve liability that has been or may be asserted against it relative to the [bonds]." Id. at *9.

The Indemnitors argue, without citation to the record or any authority, that the risk of irreparable harm is speculative "based upon the facts identified above." The Court disagrees. Selective has demanded over $800,000 of collateral based on actual claims against bonds Selective issued on behalf of KCS. It has a right to the collateral to protect itself from any loss should the Indemnitors become insolvent.

The Indemnitors also argue that Selective has not shown irreparable harm from providing immediate access to the Indemnitors' records. Selective argues that it needs access to the

Indemnitors' financial records to avoid losses "and then be left without any meaningful recourse against Indemnitors for those losses." (Doc. No. 19-1 at 14 (citing XL Specialty Ins. Co. v. Truland, No. 1:14-cv-1058, 2014 WL 4230388, at *4 (E.D. Va. Aug. 21, 2014))).

To support their position, the Indemnitors cite Sappah Brothers, which granted a preliminary injunction on posting the collateral but not on the access to the financial records because the insurance company did "not make a clear showing of irreparable harm if it is not allowed to immediately inspect the records rather than at some later date, such as in the normal course of discovery." 771 F. Supp. 2d at 575. However, here, it is undisputed that the Indemnitors are selling one property—the interest in which they previously offered to Selective as collateral—and they state in a declaration that posting an $800,000 collateral will bankrupt KCS. With those facts, the Court finds that Selective will suffer irreparable harm without immediately having access to the Indemnitors' financial records, as defined in the Indemnity Agreement.

*3. Substantial Harm to Others*

The Indemnitors argue that posting cash collateral in excess of $800,000 would bankrupt KCS and make it impossible to finish both construction projects. (Doc. No. 17 at 10.) However, as Selective argues, there is no financial information in the record regarding the Kincaids, who are individual indemnitors under the contract. Further, as the Indemnitors discuss, Selective has a vested interest in ensuring that KCS finishes the two construction projects, and it would not want to bankrupt the Indemnitors. By allowing Selective to access the Indemnitors' financial records prior to posting collateral, the parties may be able to work to an amicable resolution on what alternative collateral may be sufficient without bankrupting any of the parties. Accordingly, this factor is neutral.

*4. Public Interest*

The public interest supports granting a preliminary injunction. "There is a public interest in enforcing the terms of a valid contract." Sappah Bros., Inc., 771 F. Supp. 2d at 576 (citing UBS Painwebber, Inc. v. Aiken, 197 F. Supp. 2d 436, 448 (W.D.N.C. 2002)). "[E]nforcing surety agreements serves an important public interest by ensuring the solvency of surety companies." Great Am. Ins. Co., 2011 WL 6754072, at *10 (citing Int'l Fid. Ins. Co., 2008 WL 1931004, at *7). The Indemnitors argue, without citation to the record or authority, that the public interest would be harmed if KCS is bankrupted and unable to finish the projects. (Doc. No. 17 at 11.) However, if KCS does not have the cash to finish its projects and pay the claims on its bonds, Selective needs to know that it is exposing itself to liability.

The Court will enter an appropriate Order.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE